# EXHIBIT A

eFiled
7/9/2024 12:48:09 PM
Superior Court
of the District of Columbia

**SUPRIOR COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **STEPHANIE ARMOUR** ) | |
| **2215 38ᵗʰ STREET** ) | |
| **WASHINGTON, DC 20007** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | **Civil Action No.** ___2024-CAB-004276___ |
| v. ) | |
| ) | |
| ) | |
| **DOW JONES & COMPANY, INC.** ) | |
| **1025 CONNECTICUT AVE, NW** ) | |
| **WASHINGTON, DC 20036** ) | |
| ) | |
| Defendant. ) | |
| ) | |

**COMPLAINT FOR RELIEF FROM**
**DISABILITY DISCRIMINATION IN EMPLOYMENT**

**NATURE OF THE CASE**

1.     For over a decade, Plaintiff, Ms. Stephanie Armour ("Ms. Armour")
thought working at the WSJ was her dream job, until a change in leadership turned that
dream into a discriminatory nightmare. Throughout the bulk of her time at the WSJ—
years—Ms. Armour was accorded a series of formal and informal disability
accommodations under both the Americans with Disabilities Act and the DC Human
Rights Act.   Working with these reasonable accommodations, Ms. Armour excelled,
produced outstanding, high-impact stories, on topics such as COVID-19, Medicare, the
Affordable Care Act, and hospital accreditations.  In 2024, after a change in leadership at

the WSJ, Ms. Armour's new supervisors expressed hostility to her disability accommodations.  When Ms. Armour raised these concerns with her supervisors, they began a series of unlawful and retaliatory actions that discriminated against her in her employment.  Given her supervisors' hostility to her accommodations, Ms. Armour sought to formalize all these accommodations.  Within days of being granted such formal accommodations by the WSJ, The WSJ's new Washington Coverage Chief (bureau chief) Damian Paletta made a series of false, fraudulent and defamatory claims regarding her job performance.  He used these false, fraudulent and defamatory claims as grounds to commence a Performance Improvement (Warning) Process, the process by which the WSJ terminates employees for cause.  Paletta then used the performance review process to impose new, unreasonable and discriminatory benchmarks on Ms. Armour, with the obvious intent of using her failure to meet these benchmarks as trumped-up grounds to terminate her from the WSJ. Ms. Armour is the primary breadwinner for herself and two daughters, one of which has special needs; she could not afford to be fired and not be able to support herself and her family.  Despite her often-declared intention to remain at the WSJ for the remainder of her career, she was forced to seek and take new employment. This forced change in employment has caused her to suffer a series of damages.

2.      Defendant's actions violated the District of Columbia Human Rights Act (DCHRA), D.C. Code §§ 2-1402.11 *et seq.*[1]

3.      Defendant's actions constituted a breach of contract.

---

[1] Defendant's actions also violated the Americans with Disabilities Act, as amended, and Ms. Armour is in the process of exhausting her administrative remedies with respect to those claims.  Once that occurs, this Complaint may be amended to add her federal claims.

2

4.      Defendant's actions constituted a civil fraud against Ms. Armour.

5.      Plaintiff now seeks relief for all of the discrimination and injuries she has suffered.

**<u>JURISDICTION, VENUE AND PARTIES</u>**

6.      This Court has jurisdiction over this civil action pursuant to D.C. Code § 11-921, and D.C. Code § 2-1403.16.

7.      This Court has jurisdiction over the Defendant pursuant to D.C. Code § 13-423 because the Defendant transacts business in and maintains a place of business in the District of Columbia.  Further, the unlawful conduct complained of herein took place within the District of Columbia, primarily at Defendant's place of business.

8.      Plaintiff, Ms. Stephanie Armour, is a resident of the District of Columbia who was employed by Defendant in Washington DC from November 2013 to June 17, 2024, when she was forced to obtain alternate employment as a result of the Defendant's unlawful conduct.

9.      Defendant, Dow Jones & Company, Inc. is the owner and publisher of The Wall Street Journal (WSJ) and other media properties.  Dow Jones & Company is a Delaware corporation.  Defendant may be served through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801.  The Wall Street Journal is a division of the Dow Jones & Company, which is, in turn owned by Rupert Murdoch's News Corp.  For all relevant time periods, Defendant employed Plaintiff.  Defendant made the decisions to deny her reasonable accommodation and

3

retaliate against her, which forced her to seek alternative employment at considerable harm to her.   Defendant is an employer as defined in the relevant statutes, and employs more than 15 employees.  This Court has subject matter jurisdiction over the facts alleged herein.

## FACTUAL BACKGROUND

10.     Ms. Armour is an experienced, multiple award-wining reporter with over 30-plus years in the profession.  Ms. Armour has been nominated for a Pulitzer Prize on four occasions, including twice by the WSJ, in 2021.

11.     From 2013 to 2024, Ms. Armour was a "senior health reporter" at the WSJ.

12.     Her outstanding coverage of the COVID-19 pandemic for the WSJ, which required work on a 24-7 basis for about two years, is regarded across the industry as tops in the field.

13.     Her reporting, at the WSJ and before, has broken stories that have literally changed peoples' lives.  For example, her coverage of hospital safety and hospital accreditation process—which placed patient lives at risk—was cited by the then-head of the Centers for Medicare and Medicaid Services as the catalyst for changes in the relevant Federal regulations.  Her reporting on COVID-19, for example, helped make public the false statements about vaccine efficacy by public health officials during the pandemic.

14.     Over the course of her roughly eleven years with the WSJ, Ms. Armour has uniformly received outstanding performance reviews.  Until the false and fraudulent events set out here, she had never been given a poor review.  She has never been subject to any disciplinary action.

15.     Her capabilities and expertise as a reporter were well-recognized—and sought after—within the WSJ.  For example, in February 2023, Health Business Editor

Jonathan Rockoff emailed Ms. Armour to inform her that Health and Science Editor Stefanie Ilgenfritz had asked senior management if Ms. Armour could be internally transferred to allow her to report to Ilgenfritz's team because she liked Ms. Armour's work. The New York Bureau's desire to hire her away based on her performance occurs in the same timeframe her supervisor in Washington was ginning up false allegations of poor performance. This makes clear the illegitimacy of the WSJ's claims about her performance during this timeframe.

## THE ACCOMMODATION

16.     Ms. Armour suffers from anxiety disorder and post-traumatic stress disorder. This condition has been well-documented by her treating physicians. This condition constitutes a disability under the DC Human Rights Act.

17.     Prior to joining the staff of the WSJ, Ms. Armour worked at USA Today and Bloomberg. During her tenure at both these outlets she received an accommodation under the Americans with Disabilities Act (ADA), 42 U.S.C. ch. 126 § 12101 et seq. This accommodation enabled Armour to work at home at least two-days per week.

18.     When Ms. Armour was hired by the WSJ in 2013, the former DC Bureau Chief, Jerry Seib, told her she could work from home on a regular basis, provided not every day of the workweek. This agreement, given her ADA accommodation at her prior places of employment, was an important factor in her taking the WSJ position.

19.     Approximately six months into her tenure, Ms. Armour sought and was granted a transfer from covering banking to covering health care under Janet Adamy. Ms. Armour began working at home two days a week. This was known to Adamy. In fact, on May 7, 2014, Adamy stated Ms. Armour could work at home as needed, which Armour documented in a contemporaneous email to a friend.

5

20.     At some time in January 2015, after about seven months of working at home two days a week, Adamy and Ms. Armour had an otherwise routine disagreement over a story.  The next time Ms. Armour was present in the office, Adamy asked her to meet.   In this meeting Adamy informed Ms. Armour that she may no longer work at home two days a week.   Armour responded that her working at home was an accommodation under the ADA.  Adamy expressed disbelief that Ms. Armour required an accommodation.

21.     Ms. Armour then followed up with Seib (the Bureau Chief over Adamy) about her concerns.  In that conversation Seib told Ms. Armour she could work at home two days a week with a third day a week "floating" (flexible as to what day).

22.     However, even after Seib's approval, when Ms. Armour subsequently spoke to Adamy, Adamy told her she must now work from the office no less than four days a week, "except on rare occasions."

23.     Even though Adamy's dictate conflicted with the Bureau Chief's approval, Ms. Armour complied with Adamy's direction and proceeded to work from the office at least four days a week, although this refusal to adhere to the accommodation which had been granted caused her significant hardship and duress, which harmed her health.

24.     At the same time Ms. Armour compiled the documentation to file for a formal ADA accommodation, which she then did.

25.     Ms. Armour's accommodation paperwork included documentation from her therapist, Dr. Stefanie Consolla, stressing that Ms. Armour's symptoms have worsened because of Adamy's opposition to her working at home 2 days a week.  That document provided in pertinent part: "While she had been managing her symptoms and working quite well, she recently had a setback when her supervisor reportedly expressed discontent with her working from home 2 days a week, despite . . . working well and producing highly

6

praised work using this schedule until now."  The WSJ is aware of and has this documentation on file.

26.     On March 6, 2015, the WSJ granted Ms. Armour's ADA accommodation over Adamy's objection. This formal accommodation enabled her to work from home two days of the week.

27.     The provision of the ADA accommodation, and the legal benefits and protections that attach with it, should have resolved these issues.  However, even these legal protections did not deter Adamy.  In fact, the accommodation upset Adamy even more, causing her to take retributive actions on Ms. Armour.  Adamy's actions were so blatantly improper that Deborah Solomon, Ms. Armour's former supervisor, emailed her stating that Adamy, "clearly still has a bone to pick about your working from home, which is ridiculous and stupid considering how productive you are."

28.     Unfortunately, this is not the first time that Ms. Armour has been professionally punished for her disability while at the WSJ.   There is a common, repeated pattern at work at the WSJ.

29.     On Nov. 13, 2018, Ms. Armour went to lunch with former Bureau Chief Paul Beckett to express her interest in possibly moving into management/editing. Tenmonths later, Ms. Armour was in discussions with the New York Times, the Kaiser Family Foundation (KFF Health News), and others about possible employment.  Deputy Bureau

Chief Jay Sapsford told Ms. Armour that if she remained at the WSJ, she would have the opportunity to move into editing enterprise, likely overseeing the other policy reporters.

Acting on reliance of their promises, Ms. Armour ceased discussions with the other outlets.

In late 2019-2020, Jeanne Cummings was promoted to Deputy Bureau Chief for

7

bureauwide operations, special projects and new initiatives. At some point after taking this post, Cummings met with Ms. Armour.  During that discussion Cummings told Ms. Armour that she could not move into editing because of her accommodation to work at home.

30.     In November of 2020, Ms. Armour had a conversation with Jay Sapsford the deputy DC bureau chief.  During that discussion she learned that there was going to be a reorganization of the WSJ DC newsroom.  She also learned that, as a result of the changes, she would likely be reporting to Adamy.  In that discussion she informed Sapsford about the accommodation issues with Adamy.  Ms. Armour then asked not to be assigned Adamy as her editor.  When the reorganization occurred, Ms. Armour was assigned to report to Ben Pershing, thereby avoiding the issue.

31.     At some point in February of 2020, the WSJ went fully remote as a result of the pandemic.

32.     While millions of Americans saw their workload drastically reduced by the pandemic, Ms. Armour was the WSJ's main Washington-based COVID-19 reporter.  As a result, Ms. Armour continuously worked seven days a week, nearly 24 hours a day, for a period of two years.  During this time, she was working fully remote.

33.     In March of 2022, the WSJ began return to work.  In August of 2022, the WSJ parent company, Dow Jones, and the IAPE 1096 agreed to a Flexible Work Policy. Shortly thereafter WSJ employees were intended to return to work in office three-days-aweek.  (Although most still have not fully.)

34.     As part of return to work, Ms. Armour spoke with WSJ leadership about needing to work at home both for her accommodation and because her son was having medical issues.  Her bureau chief granted her request allowing her to work at home as often

8

as needed.  Ms. Armour was told her work performance was strong and that days in the office didn't matter.

35.     From August 2022 until February 2024, Ms. Armour was working in office one to two days of the week.   During this period, Ms. Armour's remote work flexibility was well known to the WSJ and her supervisors, and she was able to perform the essential functions of her job with that accommodation.

36.     At no time did anyone seek to rescind Ms. Armour's additional accommodation/flex days.  At no time did anyone criticize her performance or attendance. She continued to receive outstanding performance reviews.

37.     Most critically, at no time did the WSJ seek to change her work patterns per the procedure set out in Dow Jones-IAPE, agreement on work flexibility.  *See* Memorandum of Agreement Between Dow Jones and Company and IAPE/CWA Local 1096, counter-signed August 17 and 18, 2022, Appendix Dow Jones Flexible Work Policy, p. 6 (providing 45-days written notice if an employee's remote work no longer meets employer's legitimate business needs).

38.     During the period of her fully remote work, from 2019 to 2024, Ms. Armour's work was described by her then-supervisor as "stellar," and "amazing."  In fact, WSJ twice nominated the work she helped lead during this timeframe for the Pulitzer Prize and she was awarded a performance bonus—all for fully remote reporting.

39.     Ms. Armour's formal and informal accommodations were not an issue until the WSJ newsroom underwent a major restructuring in early 2024.

40.     As part of the restructuring, in February 2024, Damian Paletta took over as the WSJ's DC Coverage Chief.  At about the same time, Janet Adamy was promoted to Washington Deputy Coverage Chief to run day-to-day operations.

41.     Reporting to Adamy and Paletta was of serious concern to Ms. Armour. As set out above, years prior, Ms. Armour had briefly been supervised by Adamy.  During that period Adamy had denied Ms. Armour a reasonable accommodation under the Americans with Disabilities Act and the DC Human Rights Act.  Ms. Armour had been compelled to formally seek that same accommodation, which was granted by the WSJ. Adamy openly expressed hostility to Ms. Armour's granted accommodation.

42.     Moreover, following the reorganization, Ms. Armour (then a union board member) heard well-informed word that the WSJ was planning to use trumped up performance issues to target union-protected high-wage employees with high health costs/accommodations for termination, specifically to include Ms. Armour. Others targeted to date include: a senior reporter who had just taken extended medical leave; a disabled veteran and reporter who had taken paternity leave and whose leave was mentioned in his performance improvement plan; and, a multiple award-winning reporter who had high medical costs due to a heart condition.  Because the WSJ self-insures, terminating such employees produces both a wage and cost savings.  However, because these employees have seniority, it is difficult to terminate them except for cause.  These other layoffs which are ongoing are well documented. The suggestion that a host of senior, Pulitzer and other award-wining journalists—among the best in the world—all stopped performing at the same time is preposterous and is clear evidence of what really is going on here.

43.     Almost immediately, Adamy began to comment negatively on Ms.

10

Armour's remote work accommodations—which had been the status quo for years.  On

March 4, Adamy emailed Ms. Armour directing her to be in the office to discuss story

ideas.  Ms. Armour found this unusual, especially given Adamy's longstanding hostility to

her accommodations.

44.     On March 6th, Ms. Armour met with Ms. Elise Belisano, from the WSJ's

human resources department.  Ms. Armour told Belisano of her discussions with Paletta

and Adamy.  Ms. Armour informed Belisano of her concerns about Adamy's hostility to her

initial ADA request.  This discussion was protected activity under the District of Columbia

Human Rights Act, because it raised genuine and reasonable concerns that her new

supervisor (Adamy) would not comply with the law.

45.     On March 13, 2024, Paletta told Ms. Armour that she was required to be in

the office three days a week.

46.     During a March 14, 2024 meeting with Paletta and Adamy, Paletta told

Ms. Armour that: "You need to be in 3 days a week and I don't want to have this

conversation again."

47.     On March 15, Paletta emailed Ms. Armour "just to reiterate, employees

are to be in the bureau working with their colleagues three days a week."  Paletta's

preoccupation—obsession really—with her remote work accommodation was troubling.

48.     On March 19, Ms. Armour had a subsequent conversation with Paletta.  In

that conversation Ms. Armour explained that she needed to work remotely because of an

ongoing medical condition—a condition that was being exacerbated by Paletta's and

11

Adamy's actions towards her.  This communication was also protected activity under the DCHRA.   Paletta got upset and responded that two days a week at home was enough flexibility for any medical condition.

49.     Given Paletta's hostile response, Ms. Armour emailed WSJ's human resources department that she was worried that if she sought an accommodation she would be retaliated against.  Her email (which was also protected under the DCHRA) was prescient—that is exactly what happened.

50.     After the meeting Ms. Armour also had an exchange of emails with Paletta.  Ms. Armour raised her ADA, DCHRA, and medical condition concerns.  Paletta replied that if she had such concerns, she should take them up with WSJ's human resources department.

51.     On March 20, 2024, Ms. Armour filed a formal request for an additional ADA remote work accommodation.  In that request she documented Paletta's and Adamy's consistent opposition to any such accommodations.

52.     On April 16, 2024, the WSJ granted Ms. Armour's request for an additional, reasonable remote work accommodation.

53.     Most notably, from March 13 until April 16, 2024 (the date upon which the WSJ granted her an additional reasonable remote work accommodation), Ms. Armour complied with Paletta's requirement to be in the office three days a week— notwithstanding that the situation was having a negative effect on her physical and emotional well-being.  During this time, Ms. Armour photographically documented that the WSJ offices were all but empty day-in-and-day-out.  Which is to say, Paletta's refusal to allow Ms. Armour to work remotely was discriminatory (applying only to her), retributive

and—on information and belief—intended to cause her distress and force her out of her employment with the WSJ.

54.     Paletta's direct supervision of Ms. Armour was, in and of itself, discriminatory.  Plaintiff is aware of no other instance in which a WSJ reporter is not supervised by an editor but instead reports solely to the DC bureau chief.

55.     On April 24 2024—less than two-weeks after the WSJ approved her work from home accommodation—Paletta summoned Ms. Armour to a Performance Warning Meeting.  At this meeting he issued her a formal performance warning, which is the first step in the WSJ's termination for cause process.  *See* Memorandum, Warning—Poor Job Performance, From Damian Paletta to Stephanie Armour, dated April 24, 2024, p. 2 (the "Performance Warning").

56.     The Performance Warning triggered a 30-day review period.  As the Performance Warning noted, "Failure to demonstrate improvement in these areas and to meet these reasonable expectations may result in further disciplinary action up to and including termination of employment."  It was widely known that, once this process was begun, termination was almost always the result.[2]

57.     The metrics provided in the Performance Warning were themselves discriminatory/retaliatory and purposefully unattainable.  For example, per the Performance Warning, Ms. Armour was to produce a scoop a week.  No reporter produces a scoop a week—none.  Further, to the best of plaintiff's knowledge and investigation, no

---

[2] In certain instances, the performance review/termination process could be halted based upon a grievance under the collective-bargaining agreement.  At the time Defendant initiated this process for Ms. Armour, the union filed a grievance, which was, by rule, withdrawn when she was constructively terminated.  .

other WSJ journalist is required to produce scoops, period—let alone one a week.  Per the

Performance Warning, stories that are "conceptual scoops" were not allowed from Ms.

Armour. (Conceptual scoops are stories that build on other reporting by identifying new

trends or patterns.  The dots may have all been reported but being the first to connect the

dots in a new, meaningful way is the conceptual scoop.)  However, such conceptual scoop

stories are common reporting, including at the WSJ, and Paletta has praised them when

written by others.  These benchmarks were, in and of themselves, discriminatory and

retaliatory.  As a result, it was clear to Ms. Armour that Paletta intended to fire her after the

30-day period or thereabouts.

58.     Defendant's commencement of termination processes (coming less than a

month after Ms. Armour complained about the treatment she was receiving at work and

just over a week after she obtained an accommodation—an accommodation that she was

told by her supervisors not to even raise) was clearly unlawful discrimination and

retaliation under the DC Human Rights Act.

59.     Confronted with the knowledge that Paletta was constructing a false

justification to terminate her for cause, effective June 17th Ms. Armour was forced to resign

from her once-dream-job at the WSJ.  In order to ensure that she could provide for herself

and her family, she accepted a new job at a different media outlet

60.     Defendant's conduct here was knowing, willful and intentional. The WSJ,

specifically Paletta and Adamy, knew Ms. Armour had sought an accommodation and took

actions against her as a result. The WSJ's unlawful and discriminatory actions created a

hostile and intolerable environment—an environment that both precluded Ms. Armour

from doing her job and caused a worsening of her disability.  WSJ's unlawful and

discriminatory actions were based on false and fraudulent misrepresentations and

threatened termination.  The Performance Warning process imposed discriminatory and unattainable benchmarks, which were set to trigger termination in just one month.  It was also clear that the WSJ was not going to require Paletta and Adamy to judge her work objectively during the warning period. Because Ms. Armour is the primary support for herself and her two children (one with special needs), she could not risk having no job or income once the WSJ commenced the performance warning (termination) process.  These are significant aggravating factors here, which left her no choice but to leave her employment.  As a result, the WSJ's actions, which threatened to be "career ending" in nature, amounted to constructive discharge.  *Cf. Green v. Brennan*, 578 U.S. 547, 136 S. Ct. 1769, 575 U.S. 983, 195 L. Ed. 2d 44 (2016)(holding under analogous Federal law, constructive discharge is "tantamount" to actual discharge); *Darrow v. Dillingham & Murphy, LLP*, 902 A.2d 135, 138 (D.C. 2006)(*citing Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 362 (D.C. 1993); *Carter v. George Wash. Univ.*, 180 F.Supp.2d 97, 111 (D.D.C. 2001) (*citing Clark v. Marsh*, 665 F.2d 1168, 1173-1174 (D.C. Cir. 1981) (analyzing constructive discharge under Title VII).

61.     At all times set out herein, Plaintiff was a qualified individual with a disability who was capable of performing, and did, in fact, perform the essential functions of her job—at a multiple Pulitzer nominee level.

62.     Plaintiff had a record of disability at the time she requested accommodations for her disability.  That record was known to Defendants.  In fact, the WSJ had twice provided an accommodation.

63.     Defendant also regarded Plaintiff as suffering from a disability.

64.     The accommodations requested by, and afforded to, Ms. Armour were reasonable.  The WSJ itself admitted that fact by granting her the accommodations she

sought.  Moreover, during the pandemic Ms. Armour had worked fully remotely for years.
The WSJ awarded her a performance bonus and nominated her for two Pulitzer Prizes for
her work done remotely.  Her supervisors lauded her work ethic, and performance in her
reviews for these fully remote work periods.  Her accommodations were not just
reasonable—they inured to Defendant's benefit.

65.     Moreover, on the days when Ms. Armour was working in person at the
WSJ's Washington Office, the office was all but empty on normal workdays.  Other
individuals—including those without disabilities or accommodations—were allowed to
work remotely without the same restrictions.

66.     Defendant has not shown and cannot prove that the requested
accommodations would have amounted to an undue burden on the WSJ or posed any direct
threat to Ms. Armour or others.  To the contrary, Defendant has conceded that the
accommodations were not unduly burdensome by granting them.  Moreover, the
accommodations Ms. Armour sought were the status quo for years. It is nonsensical to
suggest that a situation that ran for years—and produced two Pulitzer Prize nominations—
was unduly burdensome to her employer.

67.     By retaliating against Ms. Armour for seeking an accommodation and for
the conduct of her supervisors which she genuinely and reasonably believed to be
unlawful, Defendant violated the DC Human Rights Act and generally failed to reasonably
accommodate Ms. Armour's disability.

68.     By constructively terminating her employment, Defendant violated the DC
Human Rights Act and failed to reasonably accommodate Ms. Armour's disability.

69.     Defendant's actions to retaliate against and constructively terminate Ms.
Armour were also motivated, at least in part, by animus and/or stereotypes regarding

persons with disabilities, and/or their impact on the workplace, and constitutes intentional disability discrimination.

70.     Defendant subjected Ms. Armour to disparate treatment based on her disability.

## THE PERFORMANCE REVIEW PROCESS

71.     As noted above, during the recent reorganization of the WSJ, it was widely discussed that the WSJ was using trumped up performance issues to target unionprotected high-wage employees with high health costs/accommodations for termination, including Ms. Armour.

72.     Along these lines, during Paletta's performance review of Ms. Armour, Paletta, acting as the agent of the Defendant, knowingly made a series of demonstrably false statements regarding Ms. Armour.

73.     For example, the WSJ's formal performance warning to Ms. Armour stated that he (Paletta) had approved three story ideas and that "we have not heard any progress on these story ideas since."  Memorandum, Warning—Poor Job Performance, From Damian Paletta to Stephanie Armour, dated April 24, 2024, p. 2 (the "Performance Warning").  This is false.  With respect to a story concerning the Pro-Life movement, on March 19, March 22, April 8, and April 15 Ms. Armour sent Paletta and Adamy extensive emails updating them on her progress. With respect to a story on Conservative Republicans efforts on health policy, Ms. Armour sent Paletta an extensive update on March 28 laying out a series of interviews and other research she had done on the issue.  Paletta never responded. As a result of Paletta's inattention, on April 23, STAT, another news outlet, scooped the WSJ on the story. The third story, concerning contraception that Paletta said he approved and did not hear back on, was, in fact, never approved—a fact made clear in a

March 14 email from Paletta to Ms. Armour.  To claim that Ms. Armour failed to follow up with him as to story ideas he approved is demonstrably false.

74.      In fact, on multiple occasions, both Adamy and Paletta rejected Ms. Armour's story ideas without having read them.

75.      The WSJ's Performance Warning also stated: "You have not proposed or executed a significant scoop in months."  *Id.* This is false.  Most notably, with respect to the Alabama judicial decision on IVF, which Paletta chastised Ms. Armour for not covering, that came to pass before Paletta had taken over her supervision.  At that time, Ms. Armour brought the issue to the attention of her then-supervisor, Ben Pershing, long before the decision was issued.  Pershing told her to pass the idea on to the WSJ's abortion reporter, which she did.  Subsequently the decision was passed down and the topic came to dominate headlines for days.  Ms. Armour proposed and produced the scoop, the WSJ did not chase the story. Similarly, on March 7, 2024, Ms. Armour alerted Paletta and Adamy to a scoop concerning the Biden White House and Medicare solvency.  She pressed Paletta and Adamy to allow her to cover the scoop—in her sound professional judgment this was a significant story and sccop.  Neither Paletta nor Adamy bothered to reply.  Days later, another reporter approached Paletta about the exact same story and Paletta directed him to cover it and later praised the reporting.  The full record shows that time and again Ms. Armour approached Paletta with timely, agenda-setting—"scoopy"—stories.  In every instance Paletta either failed to respond or rejected the ideas.  And, in virtually every instance, another news outlet subsequently broke the story as their scoop.

76.      In addition, during this timeframe Ms. Armour produced at least two significant scoops beyond her beat.  On April 9, Ms. Armour emailed her supervisor, Pershing, about a Freedom Caucus meeting she learned of at which members discussed

removing the Speaker of the House over frustrations regarding Ukraine and border policy. This lead figured prominently in the story D. Volz, L. Wise, *Speaker Johnson's Woes Grow After GOP Holdouts Block Spying Bill*, Wall Street J., Apr. 10, 2024, available at https://www.wsj.com/politics/policy/kill-fisa-trump-creates-new-headache-for-speakerjohnson-over-spy-powers-vote-96ead8a8.  On Christmas Eve, 2023, Ms. Armour learned of efforts being developed by the Federal Trade Commission to pursue Amazon. On Christmas Eve, she reported this lead to the Global Tech Editor.  She then helped the tech reporters access her source.  Her efforts culminated in the "exclusive" story, D. Mattioli, K. Safdar, *Should Amazon Be Responsible for Everything It Sells and Ships? A U.S. Agency Will Soon Decide*, Wall Street J., Feb. 1, 2024, available at https://www.wsj.com/business/retail/amazon-could-soon-be-on-hook-for-safety-of-thirdparty-products-it-sells-and-ships-be58b697.  The editor offered her a byline, but as a team player she declined.  Not recognizing her efforts to produce a scoop even on Christmas is Scrooge-worthy.  Her work produced these significant scoops for the paper.

77.     The WSJ Performance Warning stated she had produced relatively few stories since Paletta took over supervising her. *Performance Warning,* at 2-3.  To start, as noted above, this is plain false.  It also fails to account for the fact that prior to Paletta's supervision Ms. Armour was one of the WSJ's most prolific reporters and scoop generators.  For example, Ms. Armour produced four stories in May 2023; Six in April 2023; and, ten in March 2023, including four scoops.

78.     The stories Ms. Armour produced for the New York Bureau (September 2023 through Feb. 20, 2024) provide further evidence that Defendant's actions toward Ms. Armour had nothing to do with her real performance.  These stories occurred during the tenure of Emma Tucker, the relatively new and current Editor-in-Chief of the WSJ.  The

stories Ms. Armour wrote for the New York Bureau garnered large numbers of hits and

engagement—benchmarks the WSJ uses to gauge performance.  In a recent Vanity Fair

article, Tucker stressed her reliance on engagement metrics as a measure of performance:

> Tucker has instituted a new backend data system, where story performance and
> engagement are ranked across various categories, such as how many clicks from
> subscribers, how long subscribers spent engaging, new audience reach, and
> conversions. . . . Some Journal staffers flinch at Tucker's obsession with metrics. In
> monthly meetings early on, "she talked a lot about engagement, or whatever the
> euphemism for clicks was at the moment," a former reporter said. "She didn't talk a
> lot about what constitutes a good story or speak the language of reporting at all.

Charlotte Klein, "I'm Not Naive": Inside Emma Tucker's Rocky Wall Street Journal

Reboot,        Vanity        Fair,        July1,        2024,        available        at

[https://www.vanityfair.com/news/story/wall-street-journal-emma-tucker](https://www.vanityfair.com/news/story/wall-street-journal-emma-tucker).        From    an

objective performance standpoint, it makes no sense that the WSJ would discipline and

force out a journalist whose work has excelled at such metrics—given Ms. Tucker, the

Editor-in-Chief 's, "obsession" with such metrics.

79.        Similarly, the WSJ's Performance Warning criticizes Ms. Armour for not

"own[ing]" the abortion and women's reproductive health beat and not producing scoops

on this beat.  *Id.* at p. 2-3.  On Feb. 26, a former WSJ senior-most editor, who is aware of

Paletta and Adamy's criticisms, and who maintains strong ties with WSJ staffers, emailed

Ms. Armour, "I can tell you from an editor's perspective that what he (and Janet) are saying

is pure pablum – 'dominate beats,' 'best ideas' . . . ."  He added that Paletta's actions were

"a dereliction of duty."

80.        Moreover, Adamy and Paletta have repeatedly taken actions to prevent her

from "dominating" her supposed beat.  For example, on Feb. 26, Feb. 27 and Feb. 28, Ms.

Armour emailed Adamy story ideas concerning IVF.  Not one of Ms. Armour's story ideas

was ever assigned to her.  Instead, Adamy said in an email that she gave the ideas to the

health and U.S. News editors.  Ms. Armour's ideas were subsequently reported (as scoops) by the reporters Adamy gave them to.  Similarly, on March 4, 2023, having been told to "dominate" the abortion beat, Ms. Armour reached out to the WSJ's Supreme Court reporter, Jess Bravin, to discuss the upcoming abortion pill case.  When Ms. Armour asked Bravin to brainstorm coverage ideas for the case, Bravin told Ms. Armour that Adamy had already held a planning meeting with the team to discuss the case.  Further, during this timeframe, Ms. Armour was told by legal affairs reporter Laura Kusisto, who has done much of the WSJ's abortion coverage, that Paletta had told her Ms. Armour would not, in fact, be taking on or over her coverage of abortion.

81.     In simple terms, to the extent Ms. Armour's productivity may have diminished under Paletta, this wasn't a function of her performance, it was the direct result of Paletta's and Adamy's deliberate efforts to orchestrate her failure and terminate her.  To blame her for any such change is factually false.

82.     Both Ms. Armour and her prior counsel made these false statements and flagrant inconsistencies known to the WSJ and Paletta and asked that the record be corrected to prevent additional harms to her.  Neither Paletta nor the WSJ responded.  As such, their actions against her are willful, knowing, intentional and deliberate.

83.     Moreover, Paletta had no basis to make any assessment of Ms. Armour's performance.  Paletta took over the DC Bureau in February of 2024.  He commenced disciplinary proceedings against Ms. Armour on or about April 24, 2024. During the mere two months he was at the WSJ's DC Bureau he never once edited a story reported solely by Ms. Armour.[3]  His sole supervision of Ms. Armour consisted of efforts to kill her story

---

[3] The only story Paletta ever edited of Ms. Armour's was a joint byline piece written with James Grimaldi.

ideas to ensure her failure—story ideas that as a rule were subsequently reported on by competing publications to much fanfare.

84.     In addition, Paletta deliberately did not seek assessments from the editors who had, in fact, actually supervised Ms. Armour during the prior year(s).  Most notably, upon information and belief, Paletta never spoke with either Ben Pershing (who was supposed to be Ms. Armour's direct supervisor in DC), or Jonathon Rockoff (the New York editor Ms. Armour had been informally working for just before Paletta came aboard). Reviewing her performance without speaking to these individuals constituted willful managerial and professional misconduct.  In fact, on a Feb. 26 email, a former senior-most editor at the WSJ, called Paletta's actions "a dereliction of duty."

## DAMAGES INCURRED

85.     Defendant's unlawful actions have caused Plaintiff severe financial and emotional injuries, including the loss of benefits of employment (such as retirement benefits, health insurance, dental and vision insurance, and life and supplemental life

insurance), emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

86.     By forcing Ms. Armour out ahead of the new collective bargaining agreement, Ms. Armour was denied wages and benefits, including many that were retroactive, which she would have rightfully had if she had continued her employment with the WSJ as was her intent until Defendant's unlawful acts.

87.      Ms. Armour was compelled to seek new employment in the worst labor market for journalists.  In the months prior to the WSJ's unlawful acts, a series of media outlets (including the WSJ) had made significant layoffs around the nation and in the District.  Further, Ms. Armour was compelled to seek new employment in great haste and under the cloud of the WSJ's (false) performance criticisms.

88.      Newsrooms—and elite journalism in general—is a relatively small community.  Word travels fast.  The WSJ' criticisms of Ms. Armour's performance, though utterly false, have travelled fast.  As a result, Ms. Armour was forced to explain the situation, such as to colleagues with questions, to potential employers to prevent false assessments, and to sources who wondered why her byline wasn't appearing or why the WSJ wasn't publishing stories she had spoken to them for. Ms. Armour has suffered significant reputational harm.

89.      Ms. Armour took great pride in working at the WSJ.  She considered it one of the elite publications in journalism.  Working at the WSJ was a professional dream of Ms. Armour's.  She enjoyed the work and her colleagues and had a wide circle of friends at the WSJ.  She fully expected to remain at the WSJ until the date of her natural retirement. The unexpected termination of her employment, after years of outstanding reviews and exceptional journalism, caused Plaintiff tremendous emotional distress.

90.      The WSJ's unlawful actions were willful, malicious, and/or taken in reckless disregard of Ms. Armour's rights under the law.

## COUNT ONE
## DISABILITY DISCRIMINATION (Failure to Accommodate)

91.      All factual allegations of Paragraphs 1-90 are incorporated herein.

92.     Defendant failed to accommodate Plaintiff's disability in violation of the

DCHRA and unlawfully terminated her employment.

## COUNT TWO
## INTENTIONAL DISABILITY DISCRIMINATION

93.     All factual allegations of Paragraphs 1-90 are incorporated herein.

94.     Defendant intentionally discriminated against Plaintiff in violation of the

DCHRA by terminating her employment because of her disability.  *See* D.C. Code §§

2-

1402.11(1)(A).

## COUNT THREE
## DISABILITY DISCRIMINATION RETALIATION IN EMPLOYMENT

95.     All factual allegations of Paragraphs 1-90 are incorporated herein.

96.     Defendant knowingly and unlawfully, in violation of the DCHRA,

retaliated against Plaintiff for seeking a disability accommodation, and for complaining

about her manager's unlawful conduct. *See* D.C. Code §§ 2-1402.61.

## COUNT FOUR
## BREACH OF CONTRACT—GOOD FAITH

97.     All factual allegations of Paragraphs 1-90 are incorporated herein.

98.     Ms. Armour was employed at the WSJ under the terms of a collective

bargaining agreement between Dow Jones & Company and the Independent Association of

Publishers' Employees (IAPE), Local 1096 of The NewsGuild – Communications Workers

of America.  Ms. Armour was both a member of IAPE and a union Board Member.[4]

---

[4] The Dow Jones-IAPE contract had ended but had been extended by agreement.  At the time of the WSJ's actions against Ms. Armour, the union and the WSJ were in negotiations for a new contract.  Although the contract had expired, during such talks, under Federal labor law, the terms of the contract, with very few exceptions, remain in

99.     "Under District of Columbia law, every contract contains within it an implied covenant of both parties to act in good faith and damages may be recovered for its breach as part of a contract action." *Choharis v. State Farm Fire and Cas. Co.*, 961 A.2d 1080, 1087 (D.C. 2008).  A party to a contract breaches its duty of good faith and fair dealing if it "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006).

100.    Defendant's actions here, to include preventing Ms. Armour from performing her job and lying about her performance in issuing a Performance Warning, constituted a breach of her contract's implied covenant of good faith.

## COUNT FIVE
## CIVIL FRAUD

101.    All factual allegations of Paragraphs 1-90 are incorporated herein.

102.    Defendant made false statements of material facts concerning Ms. Armour's employment performance.  These statements were made, for example, in a

performance warning process that threatened Ms. Armour's job.[5]  Defendant's agents, Paletta and Adamy, who made these statements, knew they were false.  Moreover, Plaintiff and her then-counsel informed the Defendant of these falsehoods and asked that the record

_____

effect.  *See Litton Financial Printing Div. v. NLRB*, 501 US 190 206.  An employer's failure to honor the terms and conditions of an expired collective-bargaining agreement constitutes bad faith bargaining breach of the National Labor Relations Act.  *See Laborers Trust Fund v. Advanced Lightweight Conc.,* 484 US 539, 546 n. 6 (1988) (citations omitted).

[5] Supervisory appraisals sometimes have qualified immunity in defamation actions.  Plaintiff can find no such immunity as a defense to fraud.   In any event, even qualified immunity can be overcome by a showing of malice, and Defendant acted with malice here.

be corrected.  Defendant made no effort to correct these falsehoods and continued to use them in an effort to terminate Ms. Armour.  Defendant was on notice as to the falsehoods.  The intent of the Defendant—and the Defendant's agents—was to deceive.  They sought to use these false claims to impermissibly terminate Ms. Armour's employment in violation of both the DCHRA and the terms and conditions of her employment contract.  Ms. Armour relied on the Defendant—and its agent—to be honest in assessing her job performance.  Instead, they lied to advance their own illicit purposes.  This reliance is much the same as a consumer forced to rely upon the accuracy of an odometer.  Except this was worse.  The consumer can walk away; this was Ms. Armour's employer, she had no such choice.  The Plaintiff had no choice but to rely upon Defendant's representation—she had no authority to alter the false record being leveled against her.  In effect, Plaintiff was left to rely on the false statements about her job performance, which were being used to justify her termination, and which compelled her to seek new employment.  Her reliance under these circumstances was reasonable.  As a result, as set out herein, she was constructively terminated and suffered damages.  Under the law of the District of Columbia these facts make up the elements of civil fraud.  *Cf.*, *e.g., Pence v. United States,* 316 U.S. 332, 338, 62 S.Ct. 1080, 86 L.Ed. 1510 (1942)(setting out elements of fraud)*;*

---

*Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998) (applying District of Columbia fraud law).

## **RELIEF**

WHEREFORE, Plaintiff requests that this Court award her:

1)      The Plaintiff seeks either reinstatement or front pay, in lieu of reinstatement, as calculated by the difference between her salary at her new place of employment versus her salary at the WSJ (to include all raises and other monies under the new collective bargaining agreement) to compensate Plaintiff for all future financial loss resulting from the discrimination, running forward until her natural retirement age (75 years of age);

2)      Repayment of all salary (to include retroactive salary, lump sum bonuses and other increases under the new collective-bargaining agreement), bonuses, awards, benefits (in particular medical and dental benefits), and other privileges of employment that she lost as a result of the discrimination;

3)      Compensatory damages in an amount to be proved at trial, including compensation for worsening of her disability, loss of union seniority, and reputational harms, caused by Defendant's conduct, as well as for the pain, humiliation, emotional distress and loss of enjoyment of life that the discrimination has caused Plaintiff;

4)      Punitive damages in an amount to be proved at trial;

5)      Reasonable attorneys' fees and expenses;

6)      Prejudgment interest on all monetary sums awarded;

7)      Such other relief as the Court deems just.

## **JURY DEMAND**

Plaintiff requests trial by jury as to all issues in this case.

/s/

_____

27

Robert Housman (DC Bar No. 422497)
9001 Clifford Avenue
Chevy Chase, MD 20815
(202) 486-5874
rhousman@bookhillpartners.com


Counsel for Plaintiff